**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ana Erika AGRILLO–LADLAD, and
Lawrence J. Fleming,
Defendants-Appellants.**

Nos. 80–2822, 80–2826.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1981.

Decided April 14, 1982.

Robert J. Weber, Chicago, Ill., for defendants-appellants.

Joan B. Safford, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Circuit Judge, FAIRCHILD, Senior Circuit Judge, BAKER,* District Judge.

BAKER, District Judge.

The defendants, Ana Erika Agrillo-Ladlad and Lawrence J. Fleming, were convict-

---

* Honorable Harold A. Baker, District Judge for the Central District of Illinois, sitting by desig-

nation.

ed under 18 U.S.C. § 371 of conspiracy to damage and destroy, and attempting to damage and destroy, by means of an explosive, property used in an activity affecting interstate commerce. They were also convicted of the substantive offense under 18 U.S.C. § 844(i). A confederate, Jeffrey D. Bennett, was also indicted but plead guilty and became a witness for the government.

On appeal, Agrillo-Ladlad and Fleming contend that 18 U.S.C. § 844(i) is not applicable to the facts of this case and that the defendants were improperly convicted under that statute. We affirm.

### I.

The defendant, Ana Erika Agrillo-Ladlad, owned United Latino's Press, (United Latino's) a commercial printing company located on the east half of the sixth floor of 213 West Institute Place in Chicago, Illinois. Agrillo-Ladlad employed the defendants Fleming and Bennett. Fleming was the shop manager and Bennett ran the folding machine and did occasional electrical work. The defendants conspired together to destroy the business and to collect the proceeds of the fire and casualty insurance covering the business.

On March 22, 1979, at about 1:30 AM, Bennett entered the basement at 213 West Institute Place and disconnected United Latino's fire alarm and sprinkler system. Bennett then went to the sixth floor and began to lay out layers of newspapers in rows, or trailers,[1] connecting the major pieces of shop equipment to a central ignition point. After he had laid out the rows of newspapers, Bennett poured naphtha on them using a bucket and the contents of a fifty-five gallon drum of naphtha which had been purchased and delivered to United Latino's the day before. The process of laying out the newspapers and saturating them with naphtha took about 2½ hours. During the whole period of time the windows in the United Latino's premises were closed and the ambient temperature was between 55 degrees and 60 degrees Fahrenheit.

Bennett then began to assemble an electronic ignition unit which, connected with a timing device, would pass a flame through the newspapers and ignite the naphtha. He had to strip the insulation from some wires. Since he did not have wire strippers, Bennett struck a match to burn off the insulation, whereupon the naphtha that Bennett had spilled on his clothing caught fire and Bennett ran from the pressroom and extinguished the flames by rolling in a hallway rug, but only after sustaining burns on his hands and legs.

Bennett returned to United Latino's pressroom and ignited a piece of newspaper by holding it in the electric arc of an arc light. He carried the burning paper to the junction point of the three trailers and dropped it on the trailers. Bennett then left the United Latino's premises closing and locking the door behind him. Apparently Bennett went to a nearby police station and told the police he thought there was a large fire on Institute Place.

Within fifteen minutes the Chicago Fire Department was at the scene and engineer Robert Popjoy observed that the windows had blown out of United Latino's and that flames were emanating from them. After entering the premises Popjoy saw almost total destruction, bent pipes, charred and blown out windows, and warped, bent and twisted office equipment. A chandelier on the floor above was almost completely melted.

Inspector Thomas Kerner of the Chicago Bomb and Arson Squad testified for the government. From his observation of the United Latino's premises, Kerner believed that an accelerant had been spread about the premises and that vapors from the accelerant had been contained in the lower portions of the room either by the heat or humidity of the room, and that the vapors

---

1. According to an expert witness for the government, a trailer is a combustible material that is used to spread and direct fire in a particular pattern. Here the naphtha soaked rows of newspapers constituted trailers.

had been simultaneously ignited in an "explosive-type fire of rapid oxidation."[2]

Thomas Cousins, an enforcement officer of the Bureau of Alcohol, Tobacco and Firearms, Washington, D. C., testified as an expert witness for the government. Cousins testified that both naphtha and gasoline are potential explosives. It was Cousins' opinion that an uncontained explosion had occurred at United Latino's and that the uncontained explosion had been a simultaneous ignition of a vapor envelope which formed above the naphtha soaked trailers. Cousins was of the further opinion either that a contained explosion caused by ignition of the accelerant vapor build-up in the office area took place and blew out the windows, or that the explosion was caused by the natural phenomenon of heat build-up in an uncontained flash fire causing a "flash over" which blew out the windows and vented the fire. Under either possibility there was an explosion.

Cousins explained how over fifty gallons of naphtha spread over rows of newspapers to all major equipment at United Latino's and into the office area would explode when set on fire. At night the temperature in United Latino's was between 55 degrees and 60 degrees Fahrenheit. Cousins explained that just above the flash point[3] of naphtha, which is 50 degrees Fahrenheit, naphtha generates sufficient vapors which, when mixed with a certain percentage of air, form a potentially explosive mixture. "The vapors produced," Cousins explained, "are heavier than air and when the vapors are produced, they have a tendency to stay within the immediate area and ... build up and build up, until ... the proper amount of fuel to air is attained." (Record, vol. 7, at 981–82). It was Cousins' opinion that more than fifty gallons of naphtha would give off sufficient vapors to form an explosive potential, when spread along paper trailers to equipment and into the office

area of United Latino's in a temperature of above 50 degrees Fahrenheit and when combined with the air around it. Those vapors, when ignited by a flaming newspaper, could have exploded. After examining photographs of the damaged United Latino's, Cousins described the photographs as depicting the aftermath of an "explosive phenomenon." (Record, vol. 7, at 985).

## II.

The question that confronts us is whether naphtha soaked newspapers strategically spread across the floor of a building for the purpose of directing a fire and ignited by a burning newspaper is an "explosive" or "incendiary device" as defined in 18 U.S.C. § 844(j) and 18 U.S.C. § 232(5) for the purpose of prosecution under 18 U.S.C. § 844(i).

The government has two theories: first, that the defendants used a "chemical compound, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, ... that ignition by fire ... of the compound, mixture or device or any part thereof may cause an explosion," 18 U.S.C. § 844(j); second, that naphtha soaked newspapers are a device similar to an "incendiary bomb." 18 U.S.C. § 232(5)(C). Agrillo-Ladlad and Fleming argue that Congress did not intend the term "explosive" as used in 18 U.S.C. § 844(i) to include devices such as naphtha soaked trailers.

## III.

The plain meaning of the language of Title XI of the Organized Crime Control Act of 1970, the legislative history of the Act, the testimony at trial of Thomas Cousins, and the case law all support the government's position that naphtha soaked newspapers constitute an explosive under the

---

2. Rapid oxidation, according to Kerner, means that the accelerant ignites almost simultaneously. (Record, vol. 2, at 108). When a liquid accelerant simultaneously ignites, Kerner said, it explodes. (Record, vol. 2, at 111–12).

3. According to Cousins, the flash point is the lowest temperature at which a flammable liquid forms vapors which can ignite. The flash point occurs just below the explosive range of any flammable liquid. (Record, vol. 7, at 978).

terms of the Act. Pub.L. No. 91-452, 84 Stat. 922 (1970). The device used by defendants contained an "oxidizing" unit, the air in United Latino's. The device contained a "combustible" unit, the naphtha vapors, trailers of newspapers, and a rolled newspaper. The "quantities" of the oxidizing unit and combustible unit caused an "explosion" when Bennett ignited the device "by fire." The defendants argue, however, that the spreading of naphtha on the trailers was not a proportioning, mixing or packing as those terms are commonly used.

In determining whether Congress intended to exclude naphtha soaked trailers from the term "explosives," the language used in Title XI of the Organized Crime Control Act of 1970 must be studied. 2A J. Sutherland, Statutes and Statutory Construction § 45.05, at 16 (4th ed. 1973). Title XI provides two independent definitions of the term "explosives."

Section 844, subsections (d) through (i) of Title XI created new federal criminal offenses for maliciously using or attempting to use or threatening to use explosives against proscribed targets, including commercial properties. Section 844(j) defines the term "explosive" for purposes of section 844(i) and other sections dealing with the malicious use of explosives:

> For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section, the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuses (other than electric circuit breakers), detonaters, and other detonating agents, smokeless powders, other explosive or in-

cendiary devices within the meaning of paragraph (5) of section 232 of this Title and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j).

Section 232(5), which section 844(j) incorporates by reference further defines the term "explosive or incendiary device" as follows:

> The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

18 U.S.C. § 232(5).

Section 841(d) of the Act gives a much narrower definition of the term "explosives" for the purpose of regulating the traffic of explosives.[4]

■ When the language of a statute is unambiguous, judicial inquiry ordinarily is at an end. *Consumer Product Safety*

---

**4.** 18 U.S.C. § 841(d) provides:

> Except for the purposes of subsections (d), (e), (f), (g), (h), (i), and (j) of § 844 of this title, "explosives" means any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonaters, safety fuses, squibs, detonating cord, igniter cord, and igniters. The Secretary shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this

chapter. For the purposes of subsections (d), (e), (f), (g), (h), and (i) of § 844 of this title, the term "explosive" is defined in subsection (j) of such § 844.

Ammonium nitrate and gasoline in a separate state are not regulated explosives since their common purpose is not exploding. *Hearings on H.R. 16699, H.R. 17154, H.R. 18573 Before Subcomm. No. 5 of the Comm. on the Judiciary*, House of Rep., 91st Cong., 2d Sess. at 157 (1970), (App. to letter from Hollis M. Dole, Ass't Sec. of the Int.); *accord* H.R.Rep. No. 91-1549, 91st Cong., 2d Sess. at 70, *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4041.

*Comm'n. v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Despite the seeming clarity of section 844(j), the legislative history of the Organized Crime Control Act should be examined to determine whether an extension of federal involvement is warranted. *See United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973). The hearings held by Subcommittee No. 5 of the House Committee on the Judiciary and the report of the House of Representatives supports the government's position that, when used with malicious intent, petroleum distillates mixed with air at normal ambient temperatures have an explosive potential and that the naphtha impregnated device used in this case falls within the definition of explosives.

Congress provided two separate definitions for the term explosive "for the purpose of including incendiary devices within the coverage of section 844(d) through (i), and to make the exceptions applicable to the regulatory provisions of this chapter inapplicable to these sections." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. at 70, *reprinted in* [1970] U.S.Code Cong. & Ad.

News 4007, 4047. During the hearings, members of Congress repeatedly expressed concern with respect to the difficulty in controlling the malicious use of common materials such as gasoline, other flammable liquids, and ammonium nitrate without overburdening sportsmen, farmers, and people engaged in legitimate manufacture, transportation, distribution and use of such materials. Two bills were considered. One, Congressman Celler's bill, H.R. 17154, had a broad definition of explosive. The other, an administration bill, H.R. 18573, had a narrower definition of explosive. *See, e.g., Hearings on H.R. 17154, H.R. 16699, H.R. 18573 Before Subcomm. No. 5 of the Comm. on the Judiciary, House of Rep.*, 91st Cong., 2d Sess. at 64, 106, 133 (1970).[5]

The bill which emerged from the committee spoke to these concerns. The bill adopted the language of the administration bill in its definition of "explosives" for the regulatory provisions and added certain exclusions. For the provisions relating to the malicious use of explosives, the bill adopted the broad definition of the term "explosives" contained in the Celler bill.

---

**5.** Hearings before Subcomm. No. 5 of the Comm. on the Judiciary, House of Rep. at 64 (statement of Ass't Attorney General Will R. Wilson):

> [I]n the composition of some of these things gasoline is used, in a Molotov cocktail, and there is another type of useable device where they take an open container of gasoline and put it on a cook stove with the pilot light. It will furnish enough heat to evaporate the gasoline and if the room is closed it will finally develop a combustible mixture in the atmosphere and the pilot light will ignite it and then the whole room will explode, so you can leave an open container of gasoline on a cook stove and make a bomb out of it that way.

*Id.* at 64; *see also id.* at 106 (statement of David Steinberg, Ex. Dir., Nat'l Council for a Responsible Firearms Policy, Inc.).

Statement of Hollis M. Dole, Ass't Sec. of the Int., comparing H.R. 17154 and H.R. 18573 with regard to the definition of explosives:

> H.R. 17154 includes "any chemical compound .... that contains .... ingredients in such proportions, quantities or packing that ignition by fire .... or by detonation .... may cause an explosion." This would include any highly flammable substance such

as *gasoline, cleaning fluids and many other commercial solvents. It also includes ammonium nitrate which is a widely-used commercial fertilizer.*

> H.R. 18573 does not cover ammonium nitrate or gasoline in a separate state since the common purpose of these two substances by themselves is not to function by explosion. When ammonium nitrate and fuel oil are mixed together, however, they become a very common explosive known to industry as a " 'blasting agent,' " and are covered by H.R. 18573.

*Id.* at 157 (emphasis added) (App. A, letter from Hollis M. Dole [Aug. 19, 1970] ).

Chairman Celler observed that "the definition of 'explosive' ... may create most of our difficulty. We need all the enlightenment we can get to get a good definition of explosives." *Id.* at 299. With respect to the testimony by explosive experts, Chairman Celler pointed out that, "We had chemical experts testify that 'explosives' is a pervasive term. The testimony was to the effect that an explosive could be made out of material in this very room. If the word explosive is so pervasive it could be extremely difficult to enforce a section proscribing mere possession." *Id.* at 307.

In the hearings Congressmen expressed special concern about the damage to federally owned buildings caused by arson. In testimony explaining the administration bill, Assistant Attorney General Will R. Wilson noted that federal jurisdiction had already entered into the area of arson: "Existing law furnishes a basis for Federal investigative and prosecutive action in certain cases of destruction or threats of destruction by arson . . . . [h]owever, it is inadequate in many important ways." *Id.* at 35; *see also id.* at 324.

In addition to the Congressmen's recognition that Title XI could apply in instances of arson, the legislative history indicates that Congress clearly anticipated an overlap in federal and state jurisdiction. The House Report described the purpose of Title XI as "to assist the States to more effectively regulate the sale, transfer and other disposition of explosives within their borders." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. at 36, *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4011. In his statement explaining the administration bill, Assistant Attorney General Wilson addressed this overlap as follows:

> We recognize that the provisions of this bill will, to a large extent, cover areas presently covered by State law. We do not intend that the Federal Government substitute for the enforcement activities of State and local authorities in this area. We have, therefore, included in the bill a provision, subsection (h), generally similar

to present section 837(e), expressing Congress' intention that this statute not be construed as preempting State law or depriving State or local law enforcement authorities of their responsibilities for investigating and prosecuting crimes involving the use of explosives.

Indeed, it is evident that the Federal investigative and prosecutive authority contained in this bill must be used selectively. *The provisions of the bill have been drawn broadly, so that prosecutions need not hinge on such essentially artificial issues as whether the explosives were moved across State lines. However, the bill's prohibitions cover many acts of violence of predominantly local concern.* It is not intended that Federal law enforcement authorities should investigate and prosecute every bomb threat or incident. Indeed, we do not have the resources to do so . . . . This flexibility will enable us to achieve maximum economy of effort and to assure that Federal law enforcement assists but does not displace the efforts of State and local officials in dealing with crimes involving explosives.

. . . Nor is it a substitute for vigorous State action. It is, however, necessary to give us the tools we need to prosecute the terrorist and I urge your prompt and favorable action.

*Hearings on H.R. 17154, H.R. 16699, H.R. 18573 Before Subcomm. No. 5 of the Comm. on the Judiciary,* House of Rep., 91st Cong., 2d Sess. at 34, 38 (1970) (emphasis added).[6]

---

**6.** *See also id.* at 60–61 (colloquy between Mr. Wilson and Mr. McCulloch):

> Mr. McCulloch . . . . I hope the story is read that there is a lack of explosives regulation in at least 32 States of the Union.
> Mr. Wilson . . . . I might say that practically all the States have an *arson* law, so that if a fire results they can come at it that way. Most of them have some type of prohibition of malicious explosions.
>
> \*   \*   \*   \*   \*   \*
>
> Mr. McCulloch . . . . The lack of vigor of some States may be one of the reasons why, as reluctant as we are to have the Federal Government take on greater responsibility for the enforcement of the criminal law, it may be necessary to do that which they should do. I refer again to my State of Ohio

not having a proscription on some of these things. (emphasis added).

*See also id.* at 61 (colloquy between Mr. Wilson and Mr. Rodino):

> Mr. Rodino: Mr. Wilson, I have before me a news article from the *New York Times,* dated April 20, 1970, which makes reference to some 20 explosions in 4 months in Seattle, Wash. The article goes on to say that city officials requested help from the Federal Bureau of Investigation. "The request for assistance from the FBI appeared routine enough at the outset, but that, too, has turned into a controversy that has further disturbed worried residents. The FBI has refused to enter the investigation saying that it has no further jurisdiction. City officials disagree."

■ The legislative history indicates that Congress intended to define broadly the term "explosive" for purposes of the malicious use of explosives sections of the Organized Crime Control Act; that Congress realized that state and federal jurisdiction would overlap in certain instances, such as arson cases; and that simple devices using common substances could be used to create an explosive within the meaning of the Act. The legislative history supports the plain meaning of the language contained in the Act. Moreover, the legislative history supports the proposition that naphtha soaked newspapers when ignited by fire are an explosive for purposes of the malicious use provisions of the Act.

## IV.

The Eighth Circuit, the Tenth Circuit and the Eleventh Circuit have had occasion in recent decisions to pass upon the validity of prosecutions under section 844(i). In *United States v. Hepp*, 656 F.2d 350 (8th Cir. 1981), a random mixture of air and methane gas was held to be an explosive within the meaning of 18 U.S.C. § 844(j). In *Hepp* the defendant and his friends were gathered in the defendant's gas station drinking and taking turns shooting a muzzle loading pistol. The defendant Hepp shot a hole in the natural gas (methane) meter in the basement of the station. When one of the drinking party turned the gas off, Hepp

directed that it be turned back on and opened a window at the top of the stairs leading to the basement. Hepp then left the filling station on a service call and during his absence the mixture of methane gas and the surrounding air was ignited by a spark of unknown origin resulting in an explosion which destroyed the filling station. In rejecting Hepp's contention that the methane gas air mixture was not an explosive within the meaning of 18 U.S.C. § 844(j), the Eighth Circuit relied both on the uncontroverted opinion of the government's expert witness that methane and oxygen are a mechanical mixture and upon the language of the statute. *Id.* at 352–53. The court also noted that the legislative history of the statute indicated that the exceptions applicable to the regulatory provisions of the statute were not applicable to its criminal sections.

In *United States v. Hewitt*, 663 F.2d 1381 (11th Cir. 1981), gasoline poured into a closed room through a chimney was held to be an explosive within the meaning of 18 U.S.C. § 844(j). A homemade delayed ignition device consisting of a cigarette inserted into a matchbox suspended by a thread into the gasoline laden atmosphere was found to be an incendiary device within the meaning of 18 U.S.C. § 844(j). The court relied for its ruling upon the testimony of expert witnesses, the plain meaning of the statute, and cited *United States v. Hepp*, 656 F.2d 350 (8th Cir. 1981).

---

I am wondering, first of all, does this bill, H.R. 16699, cover a situation such as this? If it is true that the FBI could not have interceded because they lacked jurisdiction, and the matter couldn't be resolved on the Federal level, will the bill that we have before us counter the situation?

Mr. Wilson: It would expand the basic jurisdiction of the Federal Government, and consequently the FBI in these things.

*See also id.* at 69 (Representative Poff):

Mr. Poff: Thank you. Mr. Chairman, I want to record myself as sympathetic with the sentiments the chairman expressed a moment ago with respect to those situations which involve a duality of jurisdiction.... In most cases, even if this legislation were passed in its present form, the conduct involved would be subject to the proscription of a specific explosive, arson, or anti riot statutes of the State.

*See also id.* at 72–73 (Zelenko, General Counsel, and Mr. Wilson):

Mr. Zelenko .... [P]age 4 of H.R. 16699, subparagraph (f) proposes to make a Federal crime of what I gather is now a State crime in just about every jurisdiction of the country; that is, the malicious damage and destruction of any business property.

Now, if Federal resources are limited why propose such a broad Federal statute in an area where State criminal law already applies?

Mr. Wilson .... [T]he whole enforcement here would be limited to rather selective situations and we do not have the resources to undertake this across the board, but this would give us the jurisdiction where we need it in a particular situation that we don't have now, and we do feel the need for that.

In *United States v. Poulos*, 667 F.2d 939 (10th Cir. 1982), the court held a mixture of gasoline and air was an explosive within the meaning of 18 U.S.C. § 844(j). In *Poulos* a government witness, who had been solicited by the defendant to destroy an office in a commercial building, testified that he stuffed styrofoam into two one-liter cola bottles and then filled the bottles with gasoline. He entered the premises to be destroyed and put one bottle down in the center of the room and began pouring the contents of the other bottle around a small back room of the two room office. Just as he had almost emptied the contents of the bottle of gasoline the fumes were ignited by the pilot light of a water heater and, as the government witness said, "it went whoom." The witness also testified that he had brought along a fuse device that he had intended to use in conjunction with a cigarette to ignite the fumes after the witness had left the premises. In determining that gasoline mixed with air was an explosive, the court relied upon the plain meaning of the statute. *Id.* at 941–942.

The Ninth Circuit, however, in *United States v. Gere*, 662 F.2d 1291 (9th Cir. 1981), reversed the conviction of a defendant convicted under 18 U.S.C. § 844(i) in connection with the arson of the building which housed the defendant's business. The fire was set by the use of trailers soaked with photocopier fluid leading from inside the building to an ignition point outside. The trailers, the court found, were, in effect, fuses running from the point of ignition into the warehouse. In *Gere* it does not appear that the trailers played any part in saturating the air within the warehouse building with an explosive substance, nor does there appear to have been any expert witness testimony that there was an explosion in connection with the burning. Moreover, the opinion does not discuss the legislative history of 18 U.S.C. § 844(i), (j). Instead, the decision relies on the cross-reference in section 844(j) to 18 U.S.C. § 232(5) and holds that federal jurisdiction should

not be broadened to reach arson cases such as *Gere.*

In *United States v. Birchfield*, 486 F.Supp. 137 (N.D.Tenn.1980), the district court held that 18 U.S.C. § 844(i) did not apply to a case in which a flaming piece of paper was thrown into a building which had been soaked with gasoline. The district court advanced four reasons for its decision: first, the case presented a common situation of arson; second, the legislative history of section 844(i) in no way indicated any Congressional intent to extend federal jurisdiction over arson cases; and third, principles of statutory construction require that criminal statutes be strictly construed. In light of our discussion of the legislative history of 18 U.S.C. § 844(i), (j) and the plain meaning of the statutory language none of these reasons in *Birchfield* is persuasive.

The fourth reason advanced in *Birchfield* was that the Michigan Court of Appeals has held under a similar Michigan statute that gasoline was not an explosive. This fourth reason also is not persuasive. The Michigan case relied on, *People v. Robinson*, 37 Mich. App. 15, 194 N.W.2d 436, aff'd., 387 Mich. 770 (1971), is easily distinguished. The Michigan Court of Appeals was interpreting a Michigan penal statute which did not define "explosives." The Michigan Court looked to the State's Motor Vehicle Code which defined the term "explosives" to mean "any chemical compound or mechanical mixture that is *commonly used or intended* for the purpose of producing an explosion ...." *Id.* at 18, 194 N.W.2d at 437 (emphasis added). *Robinson* relied upon the "commonly used or intended" requirement to hold that gasoline was not an explosive.[7]

V.

The defendants argue also that the trial court erred in permitting the jurors to consider whether the naphtha soaked newspapers used in this case were an incendiary

---

**7.** The restrictive language defining "explosives" in the Michigan Motor Vehicle Code is similar to the language defining "explosives" in

the regulatory provisions of the federal legislation. See *supra*, note 4.

device. The defendants contend that because the trial court gave the jurors an instruction based upon an erroneous theory, there must be a reversal. *United States v. Donnelly*, 179 F.2d 227, 233 (7th Cir. 1950).

Under section 232(5), which section 844(j) incorporates by reference, an incendiary device is "any incendiary bomb or grenade, fire bomb, or similar device." 18 U.S.C. § 232(5). The defendants and the government disagree as to whether "similar device" includes the naphtha soaked newspapers employed by Bennett. In this case the legislative history and the expert testimony illuminate the reach of section 232(5). First, there need only be a potential for explosion. And second, Congress understood the term "bomb" to cover a wide range of explosives. As previously noted, there was testimony before the House Judiciary Subcommittee that considered the legislation that Congress understood the terms "bomb" and "incendiary device" to cover a wide range of explosives.

In this case the witness Thomas Cousins, while testifying as an expert for the government, described the characteristics of an incendiary device as a group of components designed to spread and direct fire, with a source of ignition and no industrial application. (Record, vol. 7, at 988–89). Cousins concluded that the system of naphtha soaked newspaper directing fire to equipment in combination with the flaming newspaper used for igniting the system constituted an incendiary device.

The trial judge correctly submitted the theory of incendiary device to the jurors.

Based upon the circumstances of this case, the plain meaning of the statute and its legislative history, and the expert testimony offered at trial the defendants were properly convicted under the provisions of 18 U.S.C. § 844(i) and the judgment of the district court is affirmed.

* Pursuant to Circuit Rule 16, this opinion has been circulated among all judges of this court in regular active service because it creates a conflict between the Seventh and Tenth Circuits. No judge, except Judge Richard A. Posner, voted to hear the matter *en banc*.