**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Archie Travis BELDIN and Bennie Lee
Hanna, Defendants-Appellants.**

**No. 83–1503.**

United States Court of Appeals,
Fifth Circuit.

July 13, 1984.

Rehearing Denied Aug. 14, 1984.

William F. Lovelace, Mesquite, Tex., (court-appointed), for Beldin.

Charles W. Tessmer, Dallas, Tex., for Hanna.

James A. Rolfe, U.S. Atty., Jack C. Williamson, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before BROWN, GEE and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge: *

Archie Travis Beldin and Bennie Lee Hanna were convicted of various offenses in connection with the destruction of a Texas liquor store and both were sentenced to prison terms. On appeal, both contend that they have committed no federal crime because they did not destroy the building "by means of an explosive." In addition, they dispute the sufficiency of the evidence and assign error to several procedural and evidential rulings by the district court. Hanna also challenges the propriety of his sentence. Finding no merit in any of these arguments, we affirm both convictions and Hanna's sentence.

## I.

In the spring of 1980, Hanna owned and operated a beer and liquor store, and a service station which also sold beer and wine in the small town of Angus, Texas. Next door to Hanna's service station was the Westside Discount Liquor Store. Angus boasted several other establishments that sold alcoholic beverages—the only such oases for many miles. In an effort to induce all the store owners to increase their beer prices, Hanna distributed a proposed price list to them. Westside's owner refused to adopt Hanna's proposed price increases.

Irritated by Westside's refusal, Hanna was heard to say, on various occasions, that he "wished somebody would burn that place down," that "if they didn't go up that they would just burn them out," and that "somebody could make an easy $500." On May 9, 1980, someone unsuccessfully attempted to burn Westside by placing burning gasoline-soaked rags on the store's roof. Following this attempt, a witness heard Hanna complain that "it wasn't worth $500.00 for a scorch job," and that Hanna "told them how to do it ... but they had their own way."

In reaction to the attempted burning, Westside obtained security guards to watch its store after closing. The guard on duty the night of May 11 testified that around 1:30 or 2:00 a.m. someone drove a pickup truck, later identified as Beldin's, into Hanna's service station lot, conversed with the guard a few minutes, and then left. At approximately 4:00 a.m. on May 12, one hour after the guard went off duty, the Westside store was completely destroyed by fire. One government expert witness testified that large concentrations of gasoline were detected in debris samples taken from the scene. Others speculated that the fire was set by someone who

---

* Of the numerous issues raised by the defendants on appeal, only two have precedential value. Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principals of law imposes needless expense on the public and burdens the legal profession." Pursuant to that rule the Court has determined that the non-precedential portions of this opinion should not be published.

The places at which the published opinion omits parts of the lengthy unpublished opinion are indicated by asterisks.

poured large quantities of gasoline about the premises and left some kind of delay fuse that ignited the gasoline. There was some evidence that an explosion occurred.

Hanna's employee, Bill Holloway, and Holloway's wife Doris, testified that, following the Westside fire, Hanna admonished them not to discuss it with anyone. Doris further testified that Hanna told her "if anyone talked on him, or if he spent one day in jail that he had it arranged that if it was a woman, man, or child, it didn't make any difference, that he had arrangements made to take care of them."

Beldin, Hanna's cousin, lived about sixty-five miles away in Dallas at the time of the fire and occasionally performed odd jobs for Hanna. Beldin's roommate, James Vance, testified that Beldin left their home about 10:00 p.m. May 11 and returned around 5:00 or 6:00 a.m. May 12, smelling of gasoline. Beldin explained that he had driven to Oklahoma and had run out of fuel. The next day, Beldin and his roommate drove to Angus, where Beldin placed a call to "the boss" to ask if "the job was satisfactory." Immediately thereafter the two drove to Hanna's residence. While Vance remained in Beldin's truck, Beldin briefly joined Hanna and several other persons in Hanna's back yard. On their way back to Dallas, Beldin showed Vance a roll of cash but did not reveal its source.

Sometime after the fire, possibly later that summer, Beldin visited Bill and Doris Holloway at their home. Both Holloways testified that Beldin explained to them how he had burned down Westside by using gasoline and a fuse consisting of a cigarette and a book of matches. Ronnie Bonner, Beldin's cousin, had a conversation with Beldin after Bonner's appearance before the grand jury in July of 1982. Beldin told Bonner how he had destroyed Westside and that he had received $500.00 from "fat boy." Bonner stated that Beldin always called Hanna "fat boy."

Beldin and Hanna were indicted for conspiracy to maliciously damage and destroy, by means of an explosive, a building used in an activity affecting interstate commerce, a violation of 18 U.S.C. § 844(i), 18 U.S.C. § 2, and 18 U.S.C. § 371. Count 2 of the indictment charged Beldin with the substantive offense of having maliciously damaged and destroyed the building by means of an explosive, and Hanna with aiding and abetting Beldin, violations of 18 U.S.C. § 844(i) and 18 U.S.C. § 2, respectively. The appellants were jointly tried before a jury and found guilty on both counts.

## II.

Hanna and Beldin launch a frontal assault on their convictions by arguing that this is simply not a federal case: the destruction of the Westside does not fall within the terms of the federal statute. They were convicted under 18 U.S.C. § 844(i), the pertinent part of which, at the time of the fire, prohibited the malicious destruction of property "by means of an explosive...."[1] The question presented is whether the evidence is sufficient to demonstrate that the Westside was destroyed "by means of an explosive."

We apply to this question the usual standard of review of jury verdicts: whether a reasonably minded juror must necessarily entertain a reasonable doubt of the defendant's guilt.[2] Solicitude for the integrity of the factfinding process requires us to view the evidence in the light most favorable to the government,[3] and to accept all credibility choices that tend to support the jury's verdict.[4]

---

1. The statute was amended in 1982 to proscribe destruction of property "by means of *fire* or an explosive...." Pub.L. No. 97–298 § 2, 96 Stat. 1310. The earlier statutory language, in effect at the time of the Westside fire, of course governs the present case.

2. *United States v. Rodriguez,* 654 F.2d 315, 317 (5th Cir.1981); *United States v. Kelley,* 630 F.2d 302, 303 (5th Cir.1980).

3. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

4. *Rodriguez,* 654 F.2d at 317.

The "Explosives Control Act,"[5] of which § 844 is the penalties provision, regulates the legitimate uses of explosive materials, and proscribes certain other uses (which we shall refer to as "malicious uses"),[6] including the damage or destruction of buildings used in any activity affecting interstate commerce. The term "explosives" is defined in basically two different ways, depending on the statutory provision involved. For the regulatory provisions, " 'explosives' means any chemical compound, mixture, or device, the primary or common purpose of which is to function by explosion."[7] This definition has been read to exclude gasoline from this part of the statute as an explosive.[8] The malicious-use definition is set out in § 844(j) and includes three somewhat overlapping categories: (1) articles commonly used as explosives such as gunpowder, blasting powder, detonators and detonating agents, and all forms of high explosives; (2) "other explosive or incendiary devices within the meaning of [18 U.S.C. § 232(5)],"[9] which, for our purposes, includes "any explosive bomb, grenade, missile, or similar device," and "any incendiary bomb or grenade, fire bomb, or similar device ...";[10] and (3) "any chemical compounds [sic], mechanical mixture, or device that contains oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire of the compound, mixture, or device or any part thereof may cause an explosion."[11]

The trial judge instructed the jury that the government must prove either that Beldin and Hanna used "an explosive or incendiary device" (the second category), or an "explosive" (the third category), or that an explosion actually occurred. Beldin and Hanna contend that the evidence showed, at most, a fire accelerated by uncontained gasoline ignited by a matchbook fuse in a confined area, which they say may constitute arson under state law but does not satisfy the federal statute.

Whether fuel exposed to open air, and not in a container, constitutes an explosive under § 844(j) is a question on which the circuits disagree. The Second and Ninth Circuits have held that this does not satisfy either the second or third malicious-use definitions. Relying on legislative history, the Ninth Circuit reasoned that, because § 844(i) was intended to serve as an antiterrorist measure, not as a federal arson statute, it should be interpreted narrowly. Accordingly, it has held, in *United States v. Gere*, that photocopier fluid and fluid-soaked newspapers are not an explosive or incendiary device within the meaning of § 232(5).[12] The court later applied the same reasoning to the third definition under § 844(j).[13] The Second Circuit reached the same conclusions for essentially the same reasons in *United States v. Gelb*, a case involving the ignition of uncontained gasoline with no evidence of an explosion.[14]

---

**5.** The Explosives Control Act is Title XI of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, Title XI, § 1102(a), 84 Stat. 922, 952 (1970) (codified at 18 U.S.C. §§ 841–48 (1976)).

**6.** These provisions are subsections (d)–(i) of § 844. Our label is somewhat imprecise; for § 844(a) prohibits possession of explosives in government buildings without consent of the managing official, but does not expressly require any sinister purpose.

**7.** 18 U.S.C. § 841(d). "[T]he term ['explosives'] includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters." *Id.*

**8.** *See, e.g., United States v. Lorence,* 706 F.2d 512, 515 & 517 (5th Cir.1983) (discussing legisla-

tive history); *United States v. Agrillo-Ladlad,* 675 F.2d 905, 909–10 (7th Cir.1982), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982).

**9.** 18 U.S.C. § 844(j).

**10.** 18 U.S.C. § 232(5).

**11.** 18 U.S.C. § 844(j).

**12.** *United States v. Gere,* 662 F.2d 1291, 1295–96 (9th Cir.1981).

**13.** *United States v. Cutler,* 676 F.2d 1245, 1248 & n. 1 (9th Cir.1982). *See United States v. DeLuca,* 692 F.2d 1277, 1280 (9th Cir.1982).

**14.** *United States v. Gelb,* 700 F.2d 875, 878–79 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). The Second

The Ninth Circuit, however, has since stated that, were it writing on a clean slate, it would hold that "an air-fuel mixture created by spreading gasoline inside a building" satisfies the third definition of an explosive.[15]

The Third, Fourth, Seventh, Eighth, and Tenth Circuits have read §§ 844(i) and (j) more broadly to include uncontained air-fuel mixtures.[16] In *United States v. Lorence,* this Circuit held that a fire accelerated by gasoline, in which a drum of gasoline actually exploded, fell within the third definition in § 844(j).[17]

■ The *Lorence* court pretermitted the "borderline and more difficult situation where gasoline-soaked materials are used only as a means of creating a hot, spreading, and all-consuming fire in which no explosion occurs."[18] The government adopts the same fail-safe argument here by contending that the evidence establishes the occurrence of an explosion. One witness who lived next door to the Westside testified to being awakened the morning of

the fire by "a loud noise." An investigator for the state fire marshal's office found shattered glass outside the building "indicating to me that there has been an explosion inside the building forcing the glass out," but this was an isolated expression in the course of testimony directed to other subjects. The government simply did not rely on this theory of the case at the time of trial and the effort to apply it now finds little support in the record. Instead of following it, we join the other circuits that have held that the statute may apply to uncontained air-fuel mixtures.

■ The third malicious-use category, literally read, extends to "any chemical compounds [or] chemical mixture ... in such proportions [or] quantities ... that ignition by fire of the compound ... or any part thereof may cause an explosion." It is common knowledge, of which we may take judicial notice,[19] that gasoline, when ignited, not only burns but may explode. The statutory language, therefore, easily bears application to this case.

Circuit regarded the recent amendment to § 844(i), see *supra* note 1, as an indication that Congress did not intend the original version to reach ordinary arson. *See also, United States v. Katsougrakis,* 715 F.2d 769, 771–73 (2d Cir.1983) (uncontained gasoline not an "explosive" notwithstanding occurrence of an explosion).

15. *United States v. DeLuca,* 692 F.2d 1277, 1280 (9th Cir.1982). Judge Eugene Wright authored both the *Gere* and *DeLuca* opinions. The Ninth Circuit recently adhered to *Gere* in *United States v. Reed,* 726 F.2d 570, 574–75 (9th Cir.1984) (court bound by precedent to hold that gasoline-filled cans ignited by wicks met § 844(j) definition but that uncontained gasoline ignited by delay fuse did not).
The Second Circuit recently distinguished manual ignition of spread gasoline from ignition, by an electric hotplate and timer device, of natural gas confined to a building, holding the latter an "incendiary device" under § 232(5). *United States v. Neary,* 733 F.2d 210, 215 (2d Cir.1984).

16. *E.g., United States v. Morrow,* 717 F.2d 800, 802–03 (3d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984) (uncontained kerosene, soaking newspapers and other combustibles); *United States v. Lee,* 726 F.2d 128, 129–30 (4th Cir.1984) (uncontained gasoline ignited with a match, which might have exploded on ignition, satisfies § 844(j) ); *United States v. Agrillo-Ladlad,* 675 F.2d 905, 906–07,

913 (7th Cir.1982) (naptha spread in large quantities ignited by delay fuse, creating evidence of an explosion, is an "explosive" under second definition of § 844(j) ); *United States v. Hepp,* 656 F.2d 350, 352–53 (8th Cir.1981) (random mixture of methane and air ignited by spark of unknown origin, which resulted in an explosion, held to be an explosive); *United States v. Poulos,* 667 F.2d 939, 941–42 (10th Cir.1982) (uncontained gasoline ignited by pilot light of water heater was an explosive; statutory definitions not void for vagueness; *United States v. Bunney,* 705 F.2d 378, 380–81 (10th Cir.1983) (uncontained gasoline ignited by matchbook fuse was explosive; definition does not require actual explosion).
The Sixth Circuit has held that a combination of gasoline and several cannisters of propane constitutes an "incendiary bomb" under § 232(5). *United States v. Avery,* 717 F.2d 1020, 1023–24 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). The Eleventh Circuit pretermitted the question in *United States v. Hewitt,* 663 F.2d 1381, 1390 n. 16 (11th Cir.1981).

17. *United States v. Lorence,* 706 F.2d 512, 516–17 (5th Cir.1983).

18. 706 F.2d 512, 516 (5th Cir.1983).

19. Fed.R.Evid. 201.

■ The defendants argue, however, that the Act was intended to deter political terrorism, not ordinary arson. The Seventh Circuit's review of the legislative history, in *United States v. Agrillo-Ladlad,* refers to Congressional concern over the difficulty in "controlling malicious use of common materials such as gasoline [and] other flammable liquids … without burdening [legitimate users]."[20] The statute that finally emerged contained broad language in both the regulatory and malicious-use provisions, with specific exception to accommodate legitimate uses. The statute's history and language indicate that Congress intended its reach to be broad and to overlap state arson laws.[21] Several circuits, including our own, have interpreted the 1982 amendment to § 844(i) embodied in the Anti-Arson Act[22]—which changed the statute to read "by means of fire or an explosive"—to clarify Congress' intention that the provision be broadly read.[23]

\* \* \* \* \* \*

### III.

When the jury returned its verdict at 5:15 p.m., Beldin's attorney was absent from the courtroom. Because the courthouse parking lot closed at 6:00 p.m., he had left momentarily to make other parking arrangements after obtaining permission from the court bailiff. The trial judge, incorrectly assuming counsel for Hanna was taking the verdict for both defendants, allowed it to be read before Beldin's counsel returned. Upon counsel's return to the courtroom, he learned that: a guilty verdict had been returned against his client, no one had polled the jury, and the jury and court reporter had been discharged. The judge immediately held a conference in chambers. Beldin's attorney made no objection. And he made no request that the jury be recalled, so that the verdict could be read in his presence and so that he could request a poll if he felt it necessary to do so.

■ The right to poll the jury derives not from the Constitution, but from rule 31(d), which allows a poll at "the request of any party or upon the court's own motion."[24] Polling, therefore, is not required unless requested and may be waived by silence if adequate time is allowed for a request.[25]

■ Counsel's failure to object or to request that the jury be recalled constituted a waiver of the right. It is conceivable that had the jury been recalled, such a delayed poll would not have been satisfactory. It is possible that a poll would have disclosed nothing, that it would have revealed grounds for a mistrial, or that it would have been inconclusive because taken too late. A timely request from counsel, however, would have given the trial court the opportunity to assess the poll's quality and to rule accordingly on a motion for a mistrial. Although not at fault for the creation of the unfortunate situation, counsel failed to take reasonable, available steps to help resolve it. The time to protest has passed.

\* \* \* \* \* \*

For these reasons, the convictions of Hanna and Beldin, and Hanna's sentence, are AFFIRMED.

---

20. 675 F.2d 905, 909 (7th Cir.1982).

21. *Id.* at 909–11.

22. Pub.L. 97–298 § 2(c) 96 Stat. 1310 (1982).

23. *E.g. Lorence,* 706 F.2d at 517; *Agrillo-Ladlad,* 675 F.2d at 908–10. *But see supra* note 14.

24. Fed.R.Crim.P. 31(d).

25. *See. United States v. Shepherd,* 576 F.2d 719, 724 n. 3 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed. 155 (1978); *Jaca Hernandez v. Delgado,* 375 F.2d 584, 585–86 (1st Cir.1967).