UNITED STATES of America, Appellee,

v.

William Arthur WIDGERY, Appellant.

No. 80–1385.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 17, 1980.

Decided Dec. 5, 1980.

David W. Russell, Gladstone, Mo., for appellant; Robert G. Duncan, Gladstone, Mo., on brief.

Ronald S. Reed, Jr., U. S. Atty., Kansas City, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT and McMILLIAN, Circuit Judges.

BRIGHT, Circuit Judge.

Widgery was charged in a twenty–eight count indictment with mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 (1976). A jury found Widgery guilty of counts I through X of the indictment. The district court sentenced him to five years on each of the ten counts, the sentences to run concurrently, and fined him $500 on each count. On appeal Widgery contends that 1) the Government's evidence failed to establish a scheme to defraud and the requisite use of the mails and wire communications in furtherance of the alleged scheme and 2) the district court erred in refusing to grant a mistrial on grounds of jury bias and the extensive time taken for jury deliberations. We set aside his conviction on counts V and X and affirm on the remaining counts.

## I. The Charges.

William Arthur Widgery, a self–proclaimed business consultant who could "turn failing businesses around," entered into an agreement with Robo Wash, Inc., a Missouri manufacturer of automatic car wash equipment on February 4, 1977. The agreement called for Robo to transfer 625,-000 shares of "lettered" common stock to Widgery if he provided operational and administrative assistance, engaged in promotional and sales activities, and produced $135,000 in before–tax net income prior to October 1, 1977. The resultant mail and wire fraud counts upon which the Government obtained a conviction relate to alleged fraudulent orders for car wash equipment placed with Robo by Widgery.

In August 1977, Widgery and his associate, Harvey Jefferson, induced Haskell Stone, a building inspector for the City of Indianapolis, to sign a purchase order for car wash equipment, knowing that Stone owned no assets justifying an extension of credit for such a purchase. To fund this purchase order, Widgery, on behalf of Stone, applied for a Small Business Administration (SBA) loan. The Government charged that Widgery, knowing that Stone possessed no assets, filled out this loan application to falsely show that Stone owned real estate and other assets.[1] Widgery thereafter influenced George Hunter, Assistant Director of the SBA in Indianapolis, to issue an "Authorization and Loan Agreement" indicating approval of a $112,000 interim loan.[2] Widgery's mailing of the Stone purchase order to Robo forms the basis for count I of the indictment.

On the strength of Stone's $85,000 purchase order, Robo borrowed $60,000 from the Goppert Bank & Trust Company of Kansas City, Missouri. Thereafter, Widgery called the president of Robo and made the allegedly false representation that Jefferson needed an advance commission on the Stone sale to purchase an option on a car wash site. Counts II and III charged that Widgery's telephone call and Robo's subsequent wiring of an $8,550 advance constitute wire fraud.

During November of 1977, Widgery mailed to Robo an $108,482.40 purchase order signed by Larry Duggan as president of Sun Coast Dock & Davit Corporation. The contract allegedly bore the forged signature of Duggan and named a nonexistent corporation. On receipt of this purchase order, Robo borrowed $40,000 from the Goppert Bank. In count IV the Government charges that Widgery committed mail fraud

---

1. Although Widgery told Stone he would transfer stock and land to him to pump up his financial statement, this transfer was never completed.

2. Widgery took the SBA loan authorization to the Springs Valley National Bank in French Lick, Indiana. Based upon this authorization, that bank made a loan to Widgery and Stone in the amount of $112,000. This money was deposited in Widgery's account in the American–Fletcher National Bank in Indianapolis. Widgery then wrote Stone and Jefferson each a check for $3,000.

The SBA never funded this loan because of Stone's lack of credit. Widgery then applied for a SBA loan on behalf of a James Gerard. Hunter approved the Gerard loan and the Springs Valley National Bank granted Gerard interim financing based on this approval. Widgery used these proceeds to pay off the Stone loan. The SBA, however, also cancelled its authorization of the Gerard loan.

by mailing Duggan's purchase order to Robo.

Subsequent to the mailing of Duggan's purchase order, Widgery contacted the president of Robo, allegedly by telephone, to request an advance on the Duggan sale so that Widgery might purchase an option on a car wash site. Funds were deposited to Widgery's account, but the record shows no evidence of any purchase. This alleged telephone call and the wiring of an $2,218 advance by Robo form the basis for counts V and VI of the indictment.

In October 1977, Widgery mailed a purchase order to Robo on behalf of Charles Howell, representing that Howell ordered car wash equipment in the sum of $57,203. The Government alleged that Howell signed the order in blank, never intending to purchase the equipment. Again, Robo borrowed funds from the Goppert Bank on the strength of that order. The mailing of Howell's order by Widgery forms the basis for count VII. Based on the Howell purchase order, Widgery sought an advance purportedly for Jefferson to purchase an option on a car wash site. Counts VIII and IX allege that his telephone call to the president of Robo and the wiring of an $8,580 advance constitute wire fraud.

As part of his dealings with Howell, Widgery encouraged Robo to take over Midwest Cabinet Manufacturing Company of South Bend, a business owned by Howell.[3] Based on a document evidencing Midwest's agreement to the takeover, Hunter issued a SBA loan authorization letter to Robo and Midwest.[4] Widgery mailed this authorization to Robo and that mailing forms the basis for the count X mail fraud charge.[5]

3. Widgery advised Jones, the president of Robo, to take over the failing business based on Midwest's contracts with Sears, Roebuck & Co. and the United States Postal Service.

4. The SBA lost $90,000 on a previous Midwest loan approved by Hunter.

5. Robo used this loan agreement to obtain a $50,000 loan from the Goppert Bank.

In connection with the Midwest takeover, Robo agreed to pay certain expenses of Midwest. Counts XI to XXVIII charged mail fraud regarding checks Robo mailed to Widgery for these expenses. The jury found Widgery not guilty on these eighteen counts.

II. *Sufficiency of the Evidence.*

Widgery alleges that the Government's evidence failed to establish a scheme to defraud and the requisite use of the mails or wire communications. In reviewing this claim, we must view the evidence in the light most favorable to the Government and sustain the verdict if it is supported by substantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1962).

Direct evidence of intent to defraud is not required. A jury may infer intent from all the facts and circumstances of the case. *United States v. Gilbertson*, 588 F.2d 584, 587 (8th Cir. 1978). In this case there was ample evidence from which a jury could reasonably infer intent to defraud. The Government's proof clearly established a pattern of fraud in mailing the bogus purchase orders of Stone, Duggan, and Howell, in obtaining a SBA loan authorization for Stone, and in requesting advance commissions on the purchase orders.[6]

Moreover, except for count V, the Government proved the requisite mailing or use of wire facilities needed to support Widgery's conviction. The Government concedes that it failed to establish the telephone call necessary to support a conviction on count V; thus, we reverse the conviction on that count.

After carefully reviewing the evidence on count X charging Widgery with

6. Howell and Duggan denied that they ordered car wash equipment or owned sufficient assets to purchase such equipment. Stone testified that although he told Widgery he was interested in purchasing a car wash, he also informed Widgery that he had no assets. Stone also claimed that Widgery filled out the false SBA application form. Jefferson stated that he had never received advance commissions to purchase options on car wash sites.

mailing to Robo a fraudulent SBA authorization, we must conclude that the evidence is insufficient to support a conviction on this count. The SBA issued this authorization to Robo and Midwest based on a valid, written takeover agreement. Although both firms were financially unsound, there is no evidence that Widgery misrepresented their financial condition in the application or that Widgery misrepresented Midwest's financial condition to Robo in advising the takeover. Furthermore, after the takeover, Robo did pay, as agreed upon, certain expenses of Midwest; the jury rejected all of the fraud claims relating to the payment of these expenses. Widgery's conviction on count X, therefore, cannot stand.

III. *Mistrial.*

 Widgery also argues that the court should have declared a mistrial because of alleged jury misconduct[7] and because the jury deliberated eleven hours over a Saturday and a Sunday. We find no merit in either contention. The trial court clearly acted within its discretion in denying Widgery's motions for a mistrial.

Accordingly, we set aside Widgery's convictions on counts V and X and affirm his conviction on the remaining counts.

---

**7.** After several hours of jury deliberation, Widgery's counsel asserted that (male) juror number 6 has been "blowing kisses, winking [and] waving" to Miss Clark, an Assistant United States Attorney who assisted in the prosecution. Counsel requested a mistrial, asserting that the conduct of the juror had signaled either a guilty verdict or a hung jury to Ms. Clark. The court rejected counsel's suggestion as speculative, but did not foreclose a postverdict motion for relief on "some showing that this jury was prejudiced in some way." Appel-

---

lant presented no additional evidence of jury bias in his posttrial motion.

We note initially that because counsel observed the juror's allegedly improper conduct during the trial, he properly should have called the court's attention to the alleged misconduct of the juror before the close of the trial when two alternate jurors were excused. On the record made during jury deliberations supported only by counsel's statement of his observations, we cannot say that the trial court erred in denying a mistrial.