**UNITED STATES of America, Appellee,**

v.

**Joseph GELB, Defendant-Appellant.**

**Nos. 643, 644, Dockets 82–1026, 82–1264.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 14, 1982.

Decided Feb. 15, 1983.

Barry Bassis, The Legal Aid Soc., Federal Defender Services Unit, New York City, for defendant-appellant.

Max Sayah, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Mary McGowan Davis, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y.), for appellee.

Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Joseph Gelb appeals from the judgment of the United States District Court for the Eastern District of New York, Mishler, *J.*, after a jury trial convicting him of (1) maliciously damaging and destroying his business premises by means of an "explosive," 18 U.S.C. § 844(i) (1976); (2) using an "explosive" to commit a felony, 18 U.S.C. § 844(h) (1976); and (3) eight counts of mail fraud, 18 U.S.C. §§ 1341, 1342 (1976). Gelb raises four claims on appeal, arguing that (1) uncontained gasoline is not an "explosive" or "incendiary device" within the meaning of 18 U.S.C. § 844(j) (1976); (2) the evidence submitted at trial was insuffi-

cient as a matter of law to convict him; (3) the government failed to prove an intent to defraud under 18 U.S.C. §§ 1341, 1342 (1976); and (4) the court abused its discretion when denying his Rule 33 motion for a new trial.

We find that uncontained gasoline is not an "explosive" or "incendiary device" within the meaning of 18 U.S.C. § 844(j) (1976) and therefore reverse the convictions obtained under that statute. Because the additional claims raised by the appellant lack substantial merit, we affirm the decision of the district court on the remaining counts.

## BACKGROUND

Appellant Joseph Gelb owned and operated several businesses from a commercial building located at 10–12 Franklin Place in Woodmere, New York. During the evening of April 26, 1980, the Franklin Place premises were destroyed by fire. Subsequent investigations by the Nassau County Fire Marshall's office revealed that the fire was intentionally set by use of uncontained gasoline.

Appellant Gelb was indicted and charged with one count of maliciously damaging and destroying a business premises by means of an "explosive," 18 U.S.C. § 844(i) (1976); one count of using an "explosive" to commit a felony, 18 U.S.C. § 844(h) (1976); and eight counts of using the mails to defraud an insurance company, 18 U.S.C. §§ 1341, 1342 (1976). At trial, the government's case was based principally on the testimony of four expert witnesses who substantially corroborated the prosecution's theory that the Franklin Place fire was intentionally set by means of an accelerant. Two of these experts, Thomas Russo and Michael DiMarco, testified that they removed three debris samples from the fire scene shortly after the blaze, and based upon subsequent gas chromotograph testing, they detected the presence of gasoline in two of these samples. Mr. Robert Doran, a supervising fire investigator for Nassau County, testified that he examined the scene later that night,

and in his expert opinion, the fire was caused by the ignition of a volatile liquid.

Additional circumstantial evidence revealed that Gelb had more than doubled his insurance coverage approximately three weeks before the blaze and that immediately after the fire had offered to sell his business for one dollar if the prospective buyer would assume his outstanding business debts. The government also showed that Gelb entered the premises shortly before the fire and that he was observed leaving the building approximately five minutes before the blaze was reported. Finally, the evidence disclosed that the appellant grossly inflated his fire loss and fabricated some losses when submitting his insurance claim.

The trial commenced on October 19, 1981, and the jury returned its verdict approximately three weeks later, on November 5, 1981, finding the defendant guilty of all charges in the indictment. Gelb was sentenced on January 18, 1982, to a prison term of two years on each count, sentences to run concurrently. After trial, counsel for the appellant submitted a motion pursuant to Fed.R.Crim.P. 33 asking the court to order a new trial based upon evidence allegedly discovered after trial. The district judge denied the appellant's Rule 33 motion, and the present appeal followed.

## DISCUSSION

A. *Is Uncontained Gasoline an "Explosive" Within the Meaning of 18 U.S.C. § 844(j) (1976)?*

The "Explosive Control Act," which constitutes Title XI of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, Title XI, § 1102(a), 84 Stat. 922, 952 (1970) (codified at 18 U.S.C. §§ 841–48 (1976)), creates a comprehensive regulatory scheme to control the flow of "explosives" travelling in interstate commerce. The Act also contains a strong penal section which extends federal jurisdiction to those crimes where explosives are used to damage or destroy property or to commit a felony. See 18 U.S.C. § 844(h) & (i) (1976).

"Explosives" are defined in the penal section of the Act as:

(j) For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section, the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j) (1976). The definition in section 232(5), which is incorporated by reference in section 844(j), further defines "explosive" to include:

(5) The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

18 U.S.C. § 232(5) (1976).

The indictment charged the appellant with using an "explosive" to damage and destroy a commercial building and commit a felony in violation of 18 U.S.C. §§ 844(h) & (i) (1976). The parties concede for purposes of this appeal that the Franklin Place fire was caused by use of uncontained gasoline, an accelerant frequently used in the commission of arson. Indeed, the facts presented at trial revealed a classic case of arson, but failed to disclose any evidence of an

explosion or bombing. Hence, we must determine first whether Congress intended through the Explosive Control Act to extend *federal jurisdiction* to those crimes involving common law arson, and more particularly whether uncontained gasoline is properly included within the statutory definition of "explosive."

The issue presented here is not easily resolved, as evidenced by the substantial division among the federal circuit courts that have considered this question. Those circuits favoring a narrow reading explain that the Act was intended to assist federal authorities in their efforts to control the rash of "political bombings" by subversive groups in the late 1960s and was never envisaged as an anti-arson bill. *See United States v. Gere,* 662 F.2d 1291, 1296 (9th Cir.1981); *United States v. Birchfield,* 486 F.Supp. 137, 138–39 (M.D.Tenn.1980). The courts favoring a broad reading of the Act to include substances like uncontained gasoline rely on the expansive definitional language in the statute and scientific evidence showing that chemical compounds such as gasoline may cause an explosion under certain atmospheric conditions. *See United States v. Agrillo-Ladlad,* 675 F.2d 905, 907 (7th Cir.1982); *United States v. Poulos,* 667 F.2d 939, 941–42 (10th Cir.1982); *United States v. Hepp,* 656 F.2d 350, 352–53 (8th Cir.1981).

■ We are persuaded by the former view. The legislative history of the Act speaks of the dangers posed by subversive groups in the society. The perceived threat lay not so much in ideology or political objective, but rather focused on the alarming trend during the late 1960s when "selective bombing" emerged as a frequent vehicle for extreme social and political protest:

> Mr. Chairman, I am pleased that today we begin hearings on several bills designed to strengthen Federal laws against the illegal use of explosives. Last year we witnessed in this country a violent and tragic increase in bombings. Radicals from the left and from the right spread their terror throughout the land, bombing police stations, college campuses, dormitories, cafeterias, ROTC offices, high schools, antiwar coffeehouses, homes of college administrators and teachers, homes of prosecutors, theaters, public utilities, Selective Service offices, induction centers, stores, corporate headquarters, defense plants, and Federal office buildings.

*Explosives Control: Hearings on H.R. 17154, H.R. 16699, H.R. 18573 Before Subcomm. No. 5 of the House Comm. on the Judiciary (Hearings),* 91st Cong., 2d Sess. 33 (1970) (remarks of Rep. McCulloch); *see id.* at 83 (remarks of Eugene Rossides, Asst. Sec. of Treasury), 288 (remarks of Rep. Goldwater), 296 (remarks of Rep. Wylie— "The alarming increase in the use of bombs as weapons of terror, intimidation, destruction and death is a threat to social decorum and innocent law-abiding citizens that this society can no longer tolerate.").

As often occurs in the legislative forum, the Act appears to have been adopted specifically in response to an emerging social concern, in this case the tragedy of lost lives and damage to property caused by the bombings. *See, e.g., Hearings, supra,* at 129 (remarks of Hollis Dole, Asst. Sec. of Interior), 282 (remarks of Rep. Brotzman), 296 (remarks of Rep. Wylie); *see also* H.R. Rep. No. 1549, 91st Cong., 2d Sess. 6 (1970) (*House Report*), *reprinted in* 1970 U.S.Code Cong. & Ad.News, 4007, 4013 ("Bombings and the threat of bombings have become an ugly, recurrent incident of life in cities and on campuses throughout our Nation. The absence of any effective State or local controls clearly attest to the urgent need to enact strengthened Federal regulation of explosives.").

The above-cited history strongly supports the view that the Act was envisaged as anti-bombing, *not anti-arson,* legislation. We find nothing in the language or legislative history of the Act to challenge this conclusion. Moreover, responsibility for the investigation and prosecution of crimes involving common law arson has traditionally been left to the states, and we are reminded that: "[U]nless Congress conveys its purpose clearly, it will not be deemed to have

significantly changed the federal-state balance." *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).

■ The government would have us view the expansive language in 18 U.S.C. § 844(j) (1976) as a clear manifestation of congressional intent to include uncontained gasoline within the statutory definition of "explosive." "Explosive" is defined in that section to include, *inter alia:*

> [A]ny chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

We find this language, at best, ambiguous. The House Report provides some guidance by explaining that the section 844(j) penal definition of "explosive" was "broadened to include incendiary devices such as 'Molotov cocktails.' "[1] *House Report, supra, reprinted in* U.S.Code Cong. & Ad.News at 4011. There is, of course, a serious qualitative difference between bombings caused by use of Molotov cocktails and the typical arson that was perpetrated here. We will not read a general anti-arson intent into legislation that was designed to eradicate the threat of bombings by subversive groups.

Finally, we take judicial notice that Congress has recently enacted legislation to meet the arson threat. *See* Anti-Arson Act of 1982, Pub.L. No. 97–298, 96 Stat. 1319 (1982) (Anti-Arson Act). In the Anti-Arson Act, Congress has stated unequivocally that federal authorities will henceforth share responsibility with state officials to investigate and prosecute arson crimes. *See* 128 Cong.Rec. 4957 (1982) (remarks of Rep. Hughes); 4958 (remarks of Rep. McClory). Congress could have accomplished this objective twelve years earlier when enacting the Explosive Control Act, but chose instead to focus on the more imminent problem of terrorist bombings. We defer to the lawmaking wisdom of the national legislature.

The convictions obtained under the Explosive Control Act, specifically counts one and five in the indictment, are hereby reversed.

### B. Sufficiency of the Evidence

The appellant claims that the evidence presented at trial was insufficient as a matter of law to sustain his convictions. Gelb specifically asserts that the government failed to prove that he in fact set the Franklin Place fire. In view of our disposition of the preceding issue, we need not decide this question. Gelb's claim, even if we were to consider it favorably, is relevant only insofar as it challenges the evidence relating to the "explosives" counts. The mail fraud convictions were sustained by evidence wholly independent from those facts proving the arson.

### C. Mail Fraud Counts

■ To prove mail fraud under 18 U.S.C. §§ 1341, 1342 (1976), the prosecution must show that the defendant (1) participated in a scheme to defraud; and (2) knowingly used the mails to further the scheme. *See United States v. Corey,* 566 F.2d 429, 430 n.2 (2d Cir.1977); *United States v. Cyphers,* 556 F.2d 630, 632 (2d Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977). Proof of a fraudulent scheme requires evidence showing a specific intent to defraud. *See United States v. Widgery,* 636 F.2d 200, 202 (8th Cir.1980); *United States v. Beecroft,* 608 F.2d 753, 756–57 (9th Cir.1979).

The appellant claims that his mail fraud convictions should be reversed because the government failed to prove an intent to defraud. Gelb's argument appears to be that even if he were to concede intentional misrepresentations in his insurance claim,

---

1. Actually Molotov cocktails were already included in the definition of "explosive," albeit by incorporation of section 232(5) by reference. The report might well have cited a better example of incendiary devices included.

no intent to defraud is shown unless the government specifically proves that his actual losses were less than the amounts to which he was lawfully entitled under the terms of his insurance policies. Gelb points out that his proof of loss claim detailed $684,000 in damages due to the fire, which was $184,000 more than his $500,000 insurance coverage. He would have us rule that unless the government proves more than $184,000 in falsely-stated losses, no conviction may be obtained under the mail fraud statute.

 There is no requirement under 18 U.S.C. §§ 1341, 1342 (1976) that the government prove a specific amount defrauded— the proof need only be sufficient to establish a specific intent. Moreover, specific intent need not necessarily be proved by direct evidence, but may also be inferred from the defendant's actions and other circumstantial evidence. *See United States v. Widgery,* 636 F.2d at 202; *United States v. Beecroft,* 608 F.2d at 757. We must view the evidence in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Candella,* 487 F.2d 1223, 1228 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974). On this record the jury could find that the appellant intended to defraud his insurer. The trial testimony revealed that Gelb grossly inflated losses and asked his employees to verify proof of loss forms which were wholly inaccurate. The evidence is sufficient to sustain a conviction under the mail fraud statute.

### D. *Rule 33 Motion*

Gelb finally contends that the district court committed reversible error under Fed. R.Crim.P. 33 when it denied his motion for a new trial. He contends that evidence discovered after trial would have substantially contributed to his defense if presented to the jury and cites four examples of this "newly discovered" evidence:

1. That Fire Investigator Robert Doran committed perjury when he testified at trial that he did not retrieve samples of debris from the fire site. The claim of perjury is that the next morning on April 27, Doran obtained such samples which "it must be presumed, upon analysis revealed no presence of gasoline." (Aff. ¶ 15(b)).

2. The first fireman to arrive at the premises did not detect an odor of gasoline. Doran testified that he detected an odor of gasoline some six hours after the fire started.

3. Firefighters used a power saw on the roof fueled by gasoline which could have been the source of the gasoline odor.

4. "Unassailable scientific proof, based on a recently performed series of novel experiments, that the wood debris samples recovered by insurance company investigators ... were, in fact, contaminated with gasoline at some point after the fire." (Aff. ¶ 15(a)).

*See United States v. Gelb,* CR 81–00349, slip op. 1, 3–4 (E.D.N.Y. July 2, 1982) (Memorandum of Decision and Order), reprinted in Br. of Appellee, Ex. B, at 3–4.

The evidence cited by Gelb is probative, if at all, only insofar as it relates to the "explosives" charges. The mail fraud convictions were proved by evidence that is independent of the specific facts offered by Gelb. Accordingly, because we are reversing the convictions obtained under the Explosive Control Act on other grounds, there is no need to consider this Rule 33 claim.

The judgment of the district court is reversed on counts one and five. We affirm the district court's judgment on the remaining eight counts in the indictment.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

TAKOMA PARK, MD.—Gasoline vapor seeped through sewer lines and into homes yesterday, setting off several explosions and fires, forcing more than 2,000 people to evacuate and closing at least two schools, police said.

Fire officials said there were at least eight explosions and fires in single-family

homes in two counties but all were under control by early afternoon. (*United Press Bulletin,* December 17, 1982.)

In 1970, Congress made it unlawful to maliciously damage or destroy by means of an explosive a building used in any activity affecting interstate commerce, 18 U.S.C. § 844(i), and defined "explosive" in part as "any chemical compounds" containing "oxidizing and combustible units ... in such proportions ... that ignition by fire ... may cause an explosion", 18 U.S.C. § 844(j). My colleagues now hold that the jury which convicted appellant of violating this statute should not have been permitted to find, as it did, that "gasoline vapors mixed with air" is an explosive. I disagree.

Before expanding on the reasons for my disagreement, I think it well to define clearly the issue presented on this appeal. Affirmance of appellant's conviction does not hinge upon whether "uncontained" gasoline is an explosive, but upon whether evaporating gasoline, contained or confined within the four walls of a closed structure, may be found to be an explosive. If the unhappy residents of Takoma Park, combing through the debris of their destroyed homes, were asked this question, their answer, like that of the jury below, would be a resounding "yes".

The same answer would be given by experts in the field of fire prevention and control:

Flammable vapor-air explosions most frequently occur in confined spaces such as containers, tanks, rooms, or buildings. The violence of flammable vapor explosions depends upon the nature of the vapors as well as on the quantity of vapor-air mixture and the enclosure containing the mixture. . . .

Gasoline is the most widely used flammable liquid. Its generation of flammable vapors at ambient temperatures is common knowledge.

National Fire Protection Association, *Fire Protection Handbook* 4–26 (15th ed. 1981); *see also* 13 National Fire Protection Association, *National Fire Codes* 328–17, 329–8, 329–9 (1981).

That gasoline placed in an enclosed area may result in an explosion is a fact familiar to any reader of negligence cases. *See e.g., Commercial Ins. Co. v. Ferguson,* 285 F.2d 527 (5th Cir.1961); *Home Ins. Co. v. Hamilton,* 253 F.Supp. 752 (E.D.Ky.1966), *rev'd,* 395 F.2d 108 (6th Cir.1968); *Jenkins v. 313–321 West 37th St. Corp.,* 284 N.Y. 397, 31 N.E.2d 503 (1940); *Daggett v. Keshner,* 6 A.D.2d 503, 179 N.Y.S.2d 428 (1958), *aff'd,* 7 N.Y.2d 981, 199 N.Y.S.2d 41, 166 N.E.2d 324 (1960). It is not surprising, therefore, that legislative and administrative bodies, and lexicographers have defined gasoline for many years as an explosive. *Huckleberry v. Mo. Pacific R. Co.,* 324 Mo. 1025, 26 S.W.2d 980, 986 (1930). To reverse appellant's conviction, we must conclude of necessity that, when Congress enacted section 844(j), it either rejected this universally accepted definition or, for some reason, deliberately excluded malicious users of this explosive from prosecution. I believe that it did neither.

To resolve an issue of statutory analysis, we must start with the words of the statute itself, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive", *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Under the clear language of section 844(j), any chemical compound that may cause an explosion when ignited by fire is an explosive. The Treasury Department's Bureau of Alcohol, Tobacco and Firearms, which is charged by Congress with investigating and enforcing the provisions of section 844, *see* 18 U.S.C. §§ 846, 847, and whose interpretation therefore must be given "great deference", *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), believes that section 844(j) means exactly what it says:

Under Title XI of the Organized Crime Control Act of 1970 (Title 18 U.S.C., chapter 40, section 844(j), the definition of an "EXPLOSIVE" covers generic explosive

materials (*i.e.* dynamite), certain incendiary devices, AND any chemical compound (such as gasoline), combined with oxidizing units (air) that causes (or may cause) an EXPLOSION if ignited by fire or some other means of detonation. The additional element required by this statute is that the TARGET of the arson (explosives) related incident must be connected with INTERSTATE or foreign commerce. Hence, if such "EXPLOSIVES" are used to perpetrate an arson, and the interstate or foreign commerce element exists, then ATF's jurisdiction under the statute (especially section 844(i)) can be applied.

Department of the Treasury, *1979 Annual Report of the Bureau of Alcohol, Tobacco and Firearms* 41; *1980 Report* 35.

According to the Bureau's *1980 Report,* during that year it investigated 603 "Arson Incidents", which resulted in property damage exceeding $152,000,000. Gasoline made up 74.3% of the known accelerants involved. A substantial number of indictments have been secured, many of which unfortunately may be invalidated by my colleagues' interpretation of the statute.

When a statute is clear and unambiguous, as I believe section 844(j) is, there is little reasons to delve into its legislative history. *Wirtz v. Local 191, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers,* 321 F.2d 445, 448 (2d Cir.1963). Moreover, judicial wisdom has long dictated that comments by individual congressmen, other than the sponsors of the legislation in question, are not appropriate sources of information from which to discover over-all legislative intent. *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 318, 17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897); *Schwegmann Brothers v. Calvert Distillers Corp.,* 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J. concurring). This is particularly true when the comments in question are of the flag-waving type which appear to be intended primarily for publication in hometown newspapers. To the extent that legislative history is relied upon, my view of the

history of section 844(j) accords with that of the Seventh Circuit as expressed in *United States v. Agrillo-Ladlad,* 675 F.2d 905, 907–11 (7th Cir.) *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982).

The Explosive Control Act of 1970, Pub.L. No. 91–452, Title XI, § 1102(a), 84 Stat. 922, 952 (1970) (codified at 18 U.S.C. §§ 841–48 (1976)), was the successor to the Civil Rights Act of 1960, Pub.L. No. 86–449, 74 Stat. 86, 87, which it repealed. The Civil Rights Act dealt with the interstate transportation of explosives with knowledge or intent that they would be used to damage or destroy a building, and the interstate flight from prosecution or confinement after conviction for unlawfully damaging or destroying a building by fire or explosive. Although the 1960 Act became effective long before "the rash of 'political bombings' by subversive groups in the late 1960s", upon which my colleagues place great emphasis, the 1960 Act defined "explosives" in pertinent part in the same language as did the 1970 Act, *i.e.,* "any chemical compounds . . . that contains any oxidizing and combustible units . . . in such proportions . . . that ignition by fire . . . may cause an explosion." When Congress enacted the 1970 Act, it intended to strengthen and expand the criminal prohibitions that applied to the intentional use of explosives, not to weaken them. *See* H.R.Rep. No. 1549, 91st Cong.2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4013.

The provisions of section 844 were derived from a bill submitted by the administration, H.R. 16699, and a bill introduced by Congressman Celler, H.R. 17154. Congressman Celler's bill contained the broad definition of "explosives" that was incorporated in section 844(j). In response to an inquiry from the House Committee on the Judiciary which was considering the several bills, Assistant Secretary of the Interior Hollis Dole informed the Committee that "explosives" as defined in Congressman Celler's bill would "include any highly flammable substance such as gasoline, cleaning fluids and many other commercial solvents." H.R. 17154, *Explosives Control* 157.

The administration's bill, which contained a narrower definition of "explosives" became section 841(d), the regulatory provision of the 1970 Act. The House Judiciary Committee took pains to note that the term "explosives", as used in section 841(d), does not include gasoline. 1970 U.S.Code Cong. & Ad.News at 4041. The Bureau of Alcohol, Tobacco and Firearms followed suit by providing that its licensing and use regulations do not apply to gasoline manufactured, imported, or distributed for its "intended purposes". 27 C.F.R. § 55.141. Because the exceptions applicable to the regulatory provisions are inapplicable to section 844(j), 1970 U.S.Code Cong. & Ad.News at 4047, these specific references to gasoline must be deemed significant when consideration is being given to the latter section.

My colleagues' reliance upon the passage of the Anti-Arson Act of 1982 to support their holding that appellant did not violate section 844(j) is, I suggest, misplaced. The 1982 Act was passed because (1) it was difficult to prove that arson damage was caused by means of an explosive, and (2) the courts that decided *United States v. Gere,* 662 F.2d 1291 (9th Cir.1981) and *United States v. Birchfield,* 486 F.Supp. 137 (N.D.Tenn.1980) had refused to treat gasoline as a "mechanical mixture . . . that contains any oxidizing and combustible units . . . in such proportions . . . that ignition by fire . . . may cause an explosion." H.R. No. 678, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News, 2631, 2632. In enacting the Anti-Arson Act, Congress reworded subdivisions (e), (f), (h), and (i) of section 844 so that no court thereafter could misinterpret them.

I would affirm appellant's conviction on all counts.