UNITED STATES of America, Appellee,

v.

Gregory NEARY, Defendant-Appellant.

No. 873, Docket 83–1299.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1984.

Decided April 16, 1984.

Hubert J. Santos, Hartford, Conn. (Buckley & Santos, P.C., Hartford, Conn., of counsel), for defendant-appellant.

Nancy B. Lukingbeal, Asst. U.S. Atty., Hartford, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., of counsel), for appellee.

Before FEINBERG, Chief Judge, MANSFIELD and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge.

Appellant Gregory Neary appeals from a judgment of conviction entered in the District of Connecticut by Judge T. Emmet Clarie on May 10, 1983, following a jury verdict finding him guilty of (1) maliciously destroying his fast-food restaurant in East Hartford, Conn., by means of an explosive in violation of the Explosive Control Act, 18 U.S.C. § 844(i)[1] (Count One); (2) mail fraud in violation of 18 U.S.C. § 1341[2] for submitting a false insurance claim following the destruction of his restaurant (Count Two); and (3) mail fraud for submitting a false insurance claim following the earlier destruction by fire of his dry cleaning business, also in East Hartford, in violation of 18 U.S.C. § 1341 (Count Three).

Neary challenges his conviction on three grounds. First, he argues that his fast-food restaurant was not destroyed by means of an "explosive" within the meaning of 18 U.S.C. § 844(j) and that therefore Count One should be dismissed. Second, he contends that evidence with respect to prior fires to his property was so prejudicial as to outweigh its probative value and that he should therefore be granted a new trial on Count Two. Third, he asserts that the evidence of mailing in support of Count Three, which related to the earlier cleaning establishment fire, was insufficient and that the district court thus erred in failing to grant his motion of acquittal on that count. We agree with the second and third arguments. We therefore reverse, remanding Counts One and Two for a new trial and directing that Count Three be dismissed.

The record, viewed as it must be in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1940), reveals the following. On July 8, 1981, shortly before midnight, Neary's Restaurant, owned and operated by appellant, was destroyed by a gas explosion. Investigators from the East Hartford fire and police departments arrived at the scene within minutes of the explosion. They found that one wall of the restaurant had been "blown out," the roof "flipped over," and that a fire fueled by natural gas escaping from a broken pipe was burning at the northwest exterior of the building. The fire was immediately extinguished and the investigators entered the building at which time they discovered two disconnected natural gas lines in a utility room—one to a furnace and the other to a hot water heater—and a third disconnected line in the kitchen

---

1. That section provides in full:

    "(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

    In 1982, that section was amended pursuant to the Anti-Arson Act to provide for liability for the destruction of a building or property by means of "fire or an explosive," thus expanding the scope of the Explosive Control Act of 1970 which had limited liability to destruction of property by explosion only. The destruction of the property in the instant case, of course, preceded the passage of the Anti-Arson Act.

2. That section provides in full:

    "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

leading into a deep-fat frying machine. Examination of the gas pipes at the points where they were disconnected revealed no damage to the pipe threads, which normally would have occurred if they had been sundered by the blast, thus suggesting that the gas lines had deliberately been disconnected by someone prior to the explosion. There was no evidence of forced entry into the restaurant; all of the doors were bolted. Moments later, the investigators discovered an open coiled hotplate in the kitchen connected to an electric timer, scheduled to turn on at 11:30 P.M. The investigators determined that the hotplate was the origin of the explosion. At trial, one of the police investigators testified that once the natural gas began escaping into the building, it would have taken between two and five hours for it to reach an explosive level. Another investigator testified that Neary told him two days after the explosion that he had left the restaurant about 8:00 P.M. on the night of the explosion, about four hours prior to the blast.

Neary did not come to the restaurant until the next morning, stating that he feared for his family. When he did come, he stayed briefly; later that day, he sent the operator of a payloader to knock down what remained of the basic structure. The payloader was ordered off the premises by the Fire Marshal, but returned the next day to complete the job. Several witnesses testified at trial that they had observed barely damaged or undamaged expensive pieces of equipment at the restaurant and had communicated their observations to Neary; nevertheless, Neary ordered the building razed.

Other suspicious circumstances surrounded the midnight explosion. One employee stated that he had seen a large wrench on the premises the day of the explosion; that same employee testified that he had overheard Neary say to his wife: "If the place ever did blow up, it would take quite a while to get the insurance." Also, earlier on the day of the explosion, Neary asked various employees if they smelled gas; none did. Suppliers and customers noticed pieces of equipment missing during the weeks prior to the explosion.

At trial, the government suggested that Neary's motive for destroying his own restaurant was the desire to collect insurance proceeds. In December 1980, Neary had signed a potentially lucrative lease with the McDonald's Corporation. The lease, however, was contingent upon obtaining proper zoning approval from the Town of East Hartford, which had been denied. Moreover, Neary's net income exceeded his mortgage payments on the restaurant by a mere $21 per month, a paltry sum for a family of five.

The government also presented extensive testimony with respect to three prior fires to Neary's property from which he had collected insurance proceeds, thus suggesting that he was familiar with the "benefits" of property destroyed by fire. One of the mail fraud counts (Count Three) arose out of an insurance claim filed after a February 3, 1980 fire had destroyed Neary's dry cleaning business next door to the restaurant. The government alleged that Neary had inflated his insurance claim. The government did not suggest, however, that Neary had deliberately set the prior fires.

Neary countered with testimony at trial that the restaurant was underinsured, thus implying that he had no motive to destroy it. He presented further testimony that a competitor, Billy Grant, was linked to previous damage to Neary's property and that Grant feared the approval of Neary's lease. Neary thereby attempted to suggest that Grant had sabotaged his restaurant.

The jury was ultimately persuaded that Neary had deliberately destroyed his own restaurant in July 1981 in order to collect the insurance proceeds and that Neary had used the mails to collect on a false insurance claim with respect to that fire (Count Two) as well as with respect to the earlier February 1980 fire at his dry-cleaning business (Count Three). The jury found him guilty on all three counts.

## DISCUSSION

*The Alleged Violation of The Explosive Control Act, 18 U.S.C. §§ 841–848 (Count One)*

Count One of the indictment charges the defendant with violation of 18 U.S.C. § 844(i). To establish a violation of this statute the government must prove that the defendant maliciously destroyed property "by means of an explosive." Section 844(j) defines "explosive" as meaning:

"gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound mixture, or device or any part thereof may cause an explosion."

Title 18 U.S.C. § 232(5), which is incorporated by reference in the above definition provides:

"(5) The term 'explosive or incendiary device' means (A) dynamite and other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone."

Neary contends that our recent decisions in *United States v. Gelb,* 700 F.2d 875 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983), and in *United States v. Katsougrakis,* 715 F.2d 769 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), holding that uncontained gasoline is not an "explosive" within the meaning of § 844(j), mandate dismissal of Count One for the reason that for purposes of the statutory definition there is no significant difference between uncontained gasoline and uncontained natural gas. Both, he argues, must be treated the same under the statute.

The government, on the other hand, argues that, unlike the mere manual ignition of spread gasoline involved in *Gelb* and *Katsougrakis,* which did not fit within the statutory definition of explosive, the explosive device used by the defendant here consisted not merely of gas but of a hot plate, a timer and a closed restaurant, which were designed in combination to produce an explosion when the restaurant became filled with escaping gas and the timer then electrically activated the hot plate to the point where it would detonate the gas-filled restaurant. This combination, it is contended, amounted to a huge "explosive bomb," "incendiary bomb," or "similar device" as those terms are used in § 232(5), which is incorporated by reference in § 844(j). In reply, Neary argues that our *Gelb* and *Katsougrakis* holdings preclude such an interpretation because the statute was not aimed at arson but at political, subversive, or terrorist bombings. We must therefore decide whether the means used here by Neary to explode his restaurant were sufficiently distinguishable from the ignition of uncontained gasoline to constitute an explosive within the meaning of the statute.

■ In *Gelb* and *Katsougrakis* we were satisfied from our review of the legislative history of The Explosive Control Act, 18 U.S.C. §§ 841–48, that in passing that statute Congress was not concerned with the crime of arson, which is prohibited by all states, but with the destruction of property by bombing and incendiary devices of the type being used by subversive terrorist or political groups. *See* 700 F.2d at 878–79.[3]

---

**3.** Arson, however, is not limited by all states to the act of "setting fire" to property but may

Since the mere setting of a fire by an arsonist did not require use of any of the explosive devices referred to in § 844(j), we held that the statute should not be expansively interpreted to embrace such activity merely because uncontained gasoline spread around property by an arsonist happened to explode rather than merely break out in a fire upon a lighted match being touched to it. However, we did *not* rule in those decisions that the statute may be applied only to terrorist or subversive bombings. Indeed, the plain language of the statute makes it a crime for any person maliciously to damage or destroy by an explosive "any" building, vehicle or other real or personal property used in interstate commerce. The statute is not restricted to political terrorists or to the use by them of explosives against property believed by them to be controlled or possessed by persons or entities against whom they are protesting. The statute is broader in its scope. A person who maliciously uses a bomb to destroy his own property violates the plain language of the statute even though he is bent on arson rather than on what he conceives to be a political mission. Although Congress was primarily concerned with terrorist activities when it enacted the law it gave broad prosecutorial discretion to the government to select the types of offenders to be punished rather than restrict the government to more narrowly-defined groups, which Congress had the power to do. The sole condition was that the destruction of property be "by means of an explosive."

For the reasons stated in *Gelb* and *Katsougrakis* uncontained natural gas, standing alone, is not an "explosive" within the meaning of § 844(j). That statute is limited to substances or devices which are designed not merely to cause a fire but to explode, such as TNT, dynamite, blasting materials, detonating agents or even so-called "Molotov cocktails," which are defined in detail in § 232(5), *supra*, a provision that is incorporated by reference in § 844(j). Each of these substances has one common characteristic: it will explode when detonated or ignited. Uncontained gasoline and uncontained natural gas, on the other hand, are designed to burn, not explode, and will not ordinarily explode unless something more is added, such as compression or containerization. Indeed, natural gas is produced, distributed, sold and used only for burning purposes, whereas the same is not true of TNT or dynamite. Yet Congress recognized that while certain substances are *per se* explosives (e.g., TNT, dynamite, plastic explosives); man was capable of devising other mechanisms for the purpose of causing explosions. It accordingly defined the term "explosive" to embrace "devices" as described in § 232(5), including "incendiary" devices, i.e., mechanisms which will not only explode but simultaneously cause a fire (e.g., a "Molotov cocktail" which, when the wick is ignited and the bottle of gasoline is thrown, will explode and break into flames when the bottle strikes a solid object and breaks).

Therefore, although uncontained natural gas, standing alone, is not an explosive, a device or contrivance whereby natural gas is first introduced into a large closed container (in this case a locked restaurant) and then, after it has reached a sufficient density in the container to reach explosive proportions, is exploded by means of a timer and hotplate, is an explosive within the meaning of § 844(j). Accordingly we hold that the device used in the present case was an "explosive" as the term is used in the Explosive Control Act and that the case is distinguishable from *Gelb* and *Katsougrakis*. In the present case the gas was contained, not uncontained. The container

include damaging property by explosion. For instance New York's Penal Law, § 150.20 (McKinney 1980) defines Arson in the First Degree as the intentional damaging of a building "by causing an explosion or a fire" by an incendiary device being thrown or placed inside the building. Arson in the Third Degree, § 150.10, likewise refers to destruction by explosion or burning. Thus the crime of arson cannot be simply differentiated from a violation of § 844(j). Scrutiny of the means used is first necessary.

was designed to and did explode, blowing off the roof and one wall of Neary's restaurant. The fire damage was minimal, being confined to a kitchen counter.

### Evidence of Prior Fires

Neary next argues that the district court committed reversible error in permitting the government over his objection to introduce evidence with respect to prior fires involving other property owned by him and his collection of insurance proceeds as a result of those fires. The challenged testimony concerned three fires which destroyed appellant's property: a 1976 fire which partially destroyed a three-family tenement house owned by him, a 1977 fire at the same tenement house, and a February 3, 1980, fire which destroyed his dry cleaning business. The 1980 fire formed the basis of the insurance mail fraud violation alleged in Count Three. However, there is no evidence that any of the prior fires was incendiary in origin, much less that they were set by Neary. Indeed, the prosecutor stated in offering the evidence, "I'm not trying to claim he set the fire ... far away from that, I'm not making any allegations of criminal activity. But any experience with insurance, even with fires not mentioned, are [sic] very clearly relevant".

Fed.R.Evid. 404(b) permits evidence of other crimes, wrongs, or acts for the purpose of showing "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." [4] Fed. R.Evid. 403, however, provides that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." [5]

The district court admitted the evidence of the prior fires for the purpose of showing "knowledge and intent." However, the threshold question was not one of knowledge or intent but rather of identity, i.e., whether the appellant committed the criminal act alleged in the indictment against him. The evidence was clear that whoever set the fire in the defendant's restaurant was an arsonist and had the requisite intent to destroy property. Evidence of a person's prior similar acts is probative on the issue of identity, only when his commission of other acts tends to show that he had a design or plan to commit the act alleged. For the prior similar acts to be probative of identity there must be "a high degree of similarity ... [leading] to the logical inference, by virtue of the combination of common features, that a common plan or design was at the basis for all the [criminal acts] and hence that it was the [defendant] who committed this [criminal act]." *United States v. Danzey*, 594 F.2d 905, 913 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Indeed, as we have previously noted, "evidence of other crimes offered to prove identity or common plan or design must be more similar than when those crimes are offered to prove intent." *Id.* at 913 n. 6. The more unique and unusual are the common characteristics of the similar acts involved, the more probative become the prior acts, since they then are sufficiently distinctive to be viewed as "fingerprints" or "signatures" of the person charged. *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir.1978).

In the present case the only similarity between the prior acts and the acts charged against Neary is that there were

---

**4.** The Rule provides in full:

"(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**5.** The Rule provides in full:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

fires resulting in Neary's collection of insurance. Absent some direct or circumstantial evidence that the prior fires were incendiary in origin, the mere fact that he collected insurance from those fires is hardly relevant to the issue of whether he set the fire that is the subject of the present indictment. There is nothing unique or unusual about a person's knowledge that when his insured house burns he can collect on the policy; that is a matter of common knowledge. The evidence of the 1976 and 1977 fires was therefore not sufficiently probative to be admissible. Moreover, whatever possible probative value the evidence might have on the issue of identity was clearly outweighed by its extremely prejudicial character. No matter what limiting instruction might be given, the evidence presented a high risk that the jury might. nevertheless improperly infer from the occurrence of several fires that the defendant probably set the one alleged in the indictment. Accordingly, we hold that it was error to admit the evidence of the 1976 and 1977 fires and Neary's collection of insurance as a result of them. The evidence of the February 3, 1980 fire at Neary's dry cleaning business, on the other hand, stands on a different footing. Although not admissible with respect to Counts One and Two, it was properly admitted with respect to Count Three, which charges an insurance mail fraud based upon that fire.[6]

*Insufficiency of the Evidence with Respect to Count Three*

Neary finally argues that the evidence with respect to the Count Three insurance mail fraud charge was insufficient as a matter of law and that the district court erred in failing to grant his motion of acquittal at the end of the government's case. We agree.

Count Three alleges that pursuant to a scheme Neary, following the February 3, 1980 fire at his dry-cleaning business at 288 Silver Lane, East Hartford, falsely claimed to Aetna Casualty and Surety Company, the insurer, that personal property worth $16,043, including a Yamaha motorbike, was destroyed and on February 4, 1981, caused an Aetna check to be placed in a mail depository in settlement of the claim. At trial the government attempted to show that Neary had submitted an inflated estimate of the damage to his personal property on account of the fire and that he had received payment from the insurance company for that damage by means of the mails.

At the close of the government case Neary moved pursuant to Fed.R.Cr.P. 29(a) for a judgment of acquittal on the ground that no fraud had been shown. In the ensuing discussion between counsel and the court, Judge Clarie stated that he was troubled by the question of whether there had been a mailing. Thereupon Neary's counsel adopted the failure to prove mailing as a ground for his motion, stating that he did not know of any proof of mailing. At that point the only evidence bearing on the question of mailing was the following testimony of the insurance company's claims representative:

"Q. Do you recollect when [the check was sent]?

A. This check? It was—the date of the check is 2/9/81.

Q. And did you send it right away then?

A. Yes. Actually, it was delivered to—let me check my notes. I think it was delivered to his attorney. We received a release from his attorney, and the check was typed and sent to—

Q. To the lawyer?

A. It was *hand-delivered* to Attorney Scully; at that point it was also given to Mr. Neary's attorney." (Emphasis added).

---

6. In view of our decision that Count Three must be dismissed for insufficiency of the evidence, proof of the 1980 fire would not be admissible upon a retrial of Counts One and Two.

Although this evidence did not support the essential allegation of use of the mails but, on the contrary, showed that the check was hand-delivered, the government did not seek to reopen its case for the purpose of introducing evidence of mailing. Neary's counsel then put on his defense, which did not include any evidence on the subject of mailing. At the close of his evidence Neary moved for a judgment of acquittal, which was denied. In its rebuttal the government presented additional witnesses, including a secretary from the office of John F. Scully, attorney for Aetna, the insurer. She had received the check in question and testified that she had stamped the letter accompanying the check "Received" two days after the letter was dated, which suggested that the letter had been mailed. In addition, she testified that Scully then forwarded the check to another Hartford lawyer, George A. Silvester, who had represented the insured, with a letter requesting that Silvester execute and forward to Aetna a corrected proof of loss. The record is unclear whether this letter was mailed or hand-delivered.

▪ Neary argues that the district court erred in not ruling upon his Rule 29(a) motion promptly at the close of the government's case and in not then dismissing Count Three for insufficiency in the proof of mailing. We agree. Rule 29(a) provides in pertinent part that

"[t]he court on motion of a defendant or of its own motion *shall* order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." (Emphasis supplied).

In our view it is error for the trial judge, at least without the defendant's consent, to defer ruling on a defendant's motion made at the end of the government's case. *Montoya v. United States*, 402 F.2d 847, 849 (5th Cir.1968); *Cephus v. United States*, 324 F.2d 893, 897 (D.C.Cir.1963).[7] Prior to the adoption of Rule 29(a) a defendant was not entitled as a matter of right to obtain the dismissal for insufficiency of a charge at the close of the government's case. *See Cephus v. United States*, 324 F.2d 893, 897 (D.C.Cir.1963); 9 Wigmore, *Evidence* § 2496 (3d ed. 1940). The rule, by *mandating* a decision of the motion "after the evidence on either side is closed" if the evidence is insufficient, changed the common law and contemplated that in such event the motion would be granted promptly so that the defendant would then be spared the necessity of introducing a defense with respect to the charge that should have been dismissed for insufficiency. To defer ruling on the motion places the defendant in a needless dilemma that can seriously prejudice him. If, despite the insufficiency of the government's case, he should introduce evidence in his own defense he might risk curing the fatal deficiency, in which event he would be deemed in many jurisdictions to have waived his claim of insufficiency. *See, e.g., Moore v. United States*, 375 F.2d 877, 879 (8th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 92, 19 L.Ed.2d 110 (1967); *United States v. Goldstein*, 168 F.2d 666, 670 (2d Cir.1948); *People v. Corbisiero*, 290 N.Y. 191, 193–94, 48 N.E.2d 481, 482 (1943).

The intent of Rule 29(a) to require a prompt ruling by the court is reflected in

---

**7.** Our holding is not inconsistent with our decision in *United States v. Brown*, 456 F.2d 293 (2d Cir.), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972), where we stated that the "better practice ... is for the trial judge to rule promptly on such a motion so that the defendant may decide whether or not to proceed with the introduction of evidence in his defense." *Id.* at 294. We recognized that it was error to reserve decision by proceeding to state in *Brown* that if "the trial judge *erroneously* reserves decision on a motion for judgment of acquittal made at the close of the government's case," the defendant may then waive the error. *Id.* (emphasis added). We discuss below, pp. 219–220, the question of whether there was a waiver in the present case. *See also United States v. Borrone-Iglar*, 468 F.2d 419, 421–22 (2d Cir. 1972), (per curiam), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973) (citing *Brown* with approval).

the language of Rule 29(b), which, unlike Rule 29(a), provides that when

> "a motion for judgment of acquittal is made at the close of all the evidence, the court *may* reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." (Emphasis added).

Reservation by the court of its decision on a motion after the close of all evidence is permitted for the reason that, unlike the situation at the close of the government's case, it does not subject the defendant to the risk of having to decide whether to offer evidence that might waive his claim of insufficiency. We think that Rule 29(a), on the other hand, bars the court, without the defendant's consent, from deferring its decision on his Rule 29(a) motion. *Montoya v. United States*, 402 F.2d 847, 849 (5th Cir.1968); *Cephus v. United States*, 324 F.2d 893, 897 (D.C.Cir.1963).

■ The government nevertheless contends that, even if the district court erred in deferring decision on Neary's Rule 29(a) motion, Neary waived his claim of insufficiency by going forward with his own defense. Whether a defendant may waive his rights under Rule 29(a) and, if so, under what conditions, has not been definitively settled in this circuit and is the subject of differing views in other circuits.[8] In the present case we need not penetrate this thicket for the reason that, assuming his rights could be waived, Neary clearly did not waive them because he did not offer any evidence bearing on the mailing issue. At the close of the defendant's case the proof with respect to mailing was the same as it had stood at the end of the government's case. When Neary once again moved for a judgment of acquittal on the record at that stage the judge was obligated by Rule 29(a) to rule on his repeated motion, which required dismissal of Count Three for lack of any proof that the mails were knowingly used to further the alleged scheme to defraud.

■ Lastly the government asks us to hold that the deficiency was cured by its introduction by way of rebuttal of testimony indicating that two letters may have been mailed to complete payment of Neary's insurance claim. In the first place

---

**8.** Most of the circuits that have considered the question have held that if a defendant proceeds to introduce evidence after the motion to acquit has either been denied or the trial judge has reserved decision, the defendant waives his claim of insufficiency unless he renews his motion to acquit at the close of all of the evidence. *United States v. Sanders*, 639 F.2d 268 (5th Cir. 1981); *United States v. Morris*, 623 F.2d 145 (10th Cir.), *cert. denied*, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980); *United States v. Van Dyke*, 605 F.2d 220 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *United States v. Kilcullen*, 546 F.2d 435 (1st Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977); *Lucas v. United States*, 325 F.2d 867 (9th Cir.1963). The D.C. Circuit has explicitly rejected the waiver rule, *Belton v. United States*, 382 F.2d 150, 151 (D.C. Cir.1967); *Austin v. United States*, 382 F.2d 129, 138 (D.C.Cir.1967), and the Eighth Circuit has taken both positions. *United States v. Burton*, 472 F.2d 757 (8th Cir.1973) (rejecting the waiver rule); *United States v. Geelan*, 509 F.2d 737 (8th Cir.1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975) (applying the waiver rule).

In *United States v. Goldstein*, 168 F.2d 666, 670 (2d Cir.1948), we held that the defendant waived his motion to acquit by introducing curative evidence in his defense. Although we stated in *United States v. Brown*, 456 F.2d 293, 294 (2d Cir.), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972), and in *United States v. Rosengarten*, 357 F.2d 263, 266 (2d Cir.1966), that a defendant waives his right to review of the adequacy of the government's case by proceeding to introduce evidence in his own defense, at least in the absence of the judge's refusal upon demand to rule, our references make clear that we were referring to a waiver by the defendant's introduction of curative evidence; otherwise the deficiency would remain, obligating the judge to grant the motion. Moreover, in *Brown* and *Rosengarten* we held that the government's direct evidence was sufficient to withstand the motion, so that the waiver discussion was dictum. Thus we have never considered the question with which we are faced in this case: whether a defendant waives his motion to acquit if the trial court erroneously reserves decision and the defendant does not provide the necessary evidence during his case.

it is extremely doubtful that the additional evidence was sufficient to establish beyond a reasonable doubt that the mails were used. But even assuming that it could properly have been considered if it had been offered at an earlier stage in the trial, to permit its introduction by way of rebuttal, in the face of two Rule 29(a) motions that should have been granted, would make a mockery of Rule 29(a). The normal function of rebuttal is to explain or rebut evidence offered by the adverse party. *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir.1974); *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir.1963). Broad as is the trial judge's discretion to permit rebuttal, *United States v. Nussen*, 531 F.2d 15, 20 (2d Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 112, 50 L.Ed.2d 107 (1976); *United States v. Vivero*, 413 F.2d 971, 972 (2d Cir.1969), *cert. denied*, 396 U.S. 1017, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970), or reopening by the government of its case, *United States v. Sisack*, 527 F.2d 917, 919–20 (9th Cir.1975); *Simsirdag v. United States*, 315 F.2d 230, 231 (5th Cir. 1963), to do so under the present circumstances would amount to an abuse of discretion. Absent waiver, and here there was none, Neary was entitled to dismissal of Count Three on the record as it stood at the close of the government's direct case.

Accordingly the judgment of conviction is reversed and remanded with directions to dismiss Count Three of the indictment and to grant a new trial of Counts One and Two.